In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2390

NANCY J. THOMAS,

*Plaintiff-Appellant,*

*v.*

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cv-00651-TLS-JEM — **Theresa L. Springmann**, *Judge.*

ARGUED MARCH 2, 2016 — DECIDED JUNE 22, 2016

Before WOOD, *Chief Judge*, and BAUER and KANNE, *Circuit Judges*.

PER CURIAM. Nancy Thomas applied for Supplemental Security Income in 2010 when she was 55 years old. An administrative law judge identified her medically determinable impairments as degenerative changes in her back and left shoulder, Graves' disease, and dysthymic disorder (a form

of chronic depression). But the ALJ concluded that these impairments do not impose more than minimal limitations on Thomas's ability to work and denied her application. Thomas disputes the ALJ's omission of fibromyalgia from the list of impairments and contends that his conclusion about the severity of her physical impairments is not supported by substantial evidence. (She does not discuss the ALJ's conclusion that she does not have a severe *mental* impairment.) We agree with both of Thomas's contentions and remand the case for further proceedings.

## I.  BACKGROUND

Thomas was diagnosed with Graves' disease in 2006. That condition is an autoimmune disease affecting the thyroid gland. *See* STEDMAN'S MEDICAL DICTIONARY 515 (27th ed. 2000). After a few follow-up visits that same year, Thomas's health insurance lapsed, and not until January 2010 did she return to her personal physician, Dr. Volker Blankenstein. At that time she reported experiencing several months of acute, unexplained pain affecting the front of her neck. Dr. Blankenstein observed that Thomas had a slightly decreased range of motion in her neck but was not experiencing numbness, tingling, or weakness in her extremities or tenderness over her cervical spine. A CT scan returned normal results.

A month later Thomas returned to Dr. Blankenstein reporting generalized fatigue and muscle aches, which she described as affecting her shoulders and knees and, sometimes, her entire body. Dr. Blankenstein's clinical examination for symptoms of Graves' disease was "fairly benign," and he noted the normal CT scan results from the previous month,

though he wanted Thomas to consult an endocrinologist. He also concluded that Thomas suffers from joint and muscle pain but was uncertain whether the pain resulted from her Graves' disease. He posited that Thomas might suffer from osteoarthritis or a muscle disorder causing chronic pain but stated that he would wait for test results. A few days later he told Thomas that her bloodwork had not disclosed an "obvious answer" to her pain and fatigue.

In March 2010, Thomas saw the endocrinologist, Dr. Cyprian Gardine, for her Graves' disease. At the time Thomas was not having neck pain but did complain about pain in her joints and muscles, shortness of breath, chest tightness, headaches, nausea, and depression. When Thomas next saw Dr. Gardine in August and September 2010, he characterized her Graves' disease as mild. In the later visits Thomas reported additional symptoms, including more-frequent headaches, constant fatigue, hoarseness, intolerance to heat and cold, muscle weakness, a rapid heartbeat, restless sleep, and tingling in her legs after walking. The doctor opined that some of these symptoms could be related to Graves' disease.

Thomas applied for SSI in November 2010 alleging onset in June 2006. She listed as impairments Graves' disease and depression. She also described suffering two to three headaches weekly since April 2008 and mentioned that she had gone to the emergency room for this reason in May or June 2010. She reported previous employment as a cashier and janitor in 1999 and 2000 but no other work except for a short stint doing laundry and housekeeping in a nursing home in 2007.

Dr. John Taylor, a state-agency medical consultant, examined Thomas in December 2010. He confirmed that she suffers from Graves' disease and depression but opined that she did not have any functional limitations. Dr. Taylor noted that Thomas's grip strength, manipulative skills, range of motion, and ambulation all were normal. Yet despite having said that Thomas did not have any functional limitations, Dr. Taylor further concluded that she could not handle routine household chores for more than short intervals, and neither could she stand continuously for more than 15 minutes (or more than 2 hours total in an 8-hour day), sit continuously for more than 10 minutes, or walk much beyond a half block. A second state-agency medical consultant, Dr. M. Ruiz, reviewed the file in January 2011 and opined that Thomas's affliction with Graves' disease is not severe.

The Social Security Administration then denied Thomas's application for SSI in January 2011. The next month Thomas returned to Dr. Blankenstein and reported that over the previous four to six months she had experienced lower back pain which sometimes radiated into her legs down to her knees. She felt no numbness, tingling, or weakness in her extremities, however, and Dr. Blankenstein's examination revealed that she had "fairly full" range of motion in her hips. He diagnosed her with lumbago—a medical term that simply means pain in the middle and lower back—and bilateral lower extremity radiculopathy, a condition likely to cause pain, numbness, or weakness in the buttocks or legs because of pressure on a spinal nerve root. *See* STEDMAN'S MEDICAL DICTIONARY 1034 (27th ed. 2000); Michael Rubin, Nerve Root Disorders (Radiculopathies), MERCK,

https://www.merckmanuals.com/professional/neurologic-
disorders/peripheral-nervous-system-and-motor-unit-
disorders/nerve-root-disorders (last modified Mar. 2014).
Thomas also described pain radiating from her left shoulder
into her arm that had lasted three or four months. On exam-
ination, she had limited range of motion in her left arm and
could not reach behind her back. Dr. Blankenstein diagnosed
left shoulder tendonitis, possibly "a combination of rotator
cuff and osteoarthritis issues." X-rays revealed degenerative
changes in the lower lumbar spine, some spurring in both
hips, and minimal spurring of acromioclavicular joint in her
left shoulder. Dr. Blankenstein referred her for physical ther-
apy. Afterward Thomas asked the SSA to reconsider the de-
nial of benefits, but another state-agency consultant,
Dr. J. Sands, concurred with Dr. Ruiz's review—remarking
simply that his opinion was "affirmed, as written"—and in
April 2011 the agency upheld the initial determination.

Thomas immediately began seeing Dr. Asima Rashid, an
internist who diagnosed arthritis and osteoarthritis in re-
sponse to Thomas's complaints of widespread pain. Later
that month Thomas reported pain in her neck, left shoulder,
left arm, and mid-back. Thomas said that she was unable to
move her arm behind her back, and Dr. Rashid's examina-
tion showed that Thomas had tenderness in her left shoulder
and moderately reduced range of motion. Dr. Rashid sus-
pected degenerative arthritis in the left shoulder, but an X-
ray was normal.

Thomas started physical therapy in March 2011 but quit
after two sessions because she thought it was not helping. At
Dr. Blankenstein's urging she resumed with another thera-

pist in May. At an initial evaluation, that therapist noted a number of limitations on movement. Thomas was experiencing pain bending forward, backward, and side to side. Straight leg raises also caused pain, on the right at 60 degrees and on the left at 45 degrees. She had difficulty raising either heel, and stretches involving extending her right knee and rotating her hips were painful as well. Thomas decided that she was not improving and quit after six sessions, though, according to this therapist, Thomas had "refused on two occasions to do more than just lying prone and applying a moist heat pack to her back secondary to having pain all over and being dizzy." The therapist told Dr. Blankenstein that Thomas continued to complain of severe pain but was not making progress. The therapist discharged Thomas in July 2011 after she failed to return the office's calls.

Dr. Blankenstein then saw Thomas again. He noted that previous X-rays, which showed only minimal arthritic changes, did not explain the pain she reported. Thomas said that she had muscle pain affecting, at various times, her neck, torso, and extremities. Dr. Blankenstein detected tenderness over her entire thorax but no specific tenderness along her spine or any "classical rheumatoid arthritis changes." He concluded that she "most likely suffers from a myofascial pain syndrome, such as fibromyalgia." He remarked that "[s]he does not seem overly symptomatic" for Graves' disease and that he could not tie her fibromyalgia-like symptoms to that condition. He prescribed Lyrica, a medication used to treat fibromyalgia and nerve pain, and when Thomas reported a week later that this medication was helping, he remarked that this means "she almost certainly has fibromyalgia … as suspected." *See Lyrica Medication Guide*, U.S.

FOOD AND DRUG ADMIN., http://www.fda.gov/downloads/
Drugs/DrugSafety/UCM152825.pdf (last modified Dec. 2013)

Five weeks later, though, Thomas had a checkup with
Dr. Rashid, the internist, and again reported pain all over
her body and tingling, mostly on the left side. Dr. Rashid ob-
served that touching Thomas's left arm caused pain but that
her range of motion was "ok." In her progress notes Dr. Ra-
shid wrote, "Bone/joint symptoms" and muscle pains, with-
out further explanation. The doctor noted that Thomas re-
ported a "moderate" activity level including walking three
times a week for 20 minutes. Dr. Rashid also prescribed Lyr-
ica. Another X-ray of Thomas's left shoulder showed mild to
moderate osteoarthritis at the acromioclavicular joint but
nothing acute.

In January 2012, Dr. Rashid completed a questionnaire as
part of Thomas's effort to obtain disability accommodations
and services from a community college where she had been
taking classes since 2009. Dr. Rashid stated that Thomas had
been diagnosed with osteoarthritis and moderate fibromyal-
gia which were causing muscle and joint pains. She opined
that these conditions "substantially limit" Thomas's ability
to walk, work, and perform manual tasks, and prevent her
from lifting over 20 pounds. Dr. Rashid's list of Thomas's
medications did not include Lyrica but mentioned Cymbal-
ta, another medication used to treat fibromyalgia. *See Cym-
balta Medication Guide*, U.S. FOOD AND DRUG ADMIN.,
http://www.fda.gov/downloads/Drugs/DrugSafety/ucm0885
79.pdf (last visited June 10, 2016).

There are no records of further treatment before an
emergency-room visit in September 2012, when Thomas re-

ported a burning sensation in her hands and from her feet
extending up to her mid-thighs. The emergency-room doctor
diagnosed a potassium deficiency and peripheral neuropa-
thy, a name for peripheral nerve damage that causes symp-
toms ranging from "numbness or tingling, to pricking sensa-
tions … or muscle weakness." *Peripheral Neuropathy Fact
Sheet*, NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE,
http://www.ninds.nih.gov/disorders/peripheralneuropathy/
detail_peripheralneuropathy.htm (last modified Mar. 9,
2016).

Thomas finally appeared before an ALJ in October 2012,
eighteen months after her application for benefits had been
denied on reconsideration. She testified that she last worked
in 2007, doing laundry and housekeeping at the nursing
home. She had hurt her knee and eventually quit, she ex-
plained, since even assignments to lighter tasks had proved
difficult to manage. Afterward she had returned to school to
obtain a certificate in childcare but completed only a few
classes. She was living with an adult daughter and helping
with cooking and housework. She could manage self-care
tasks with enough time. She described feeling numbness and
aches in her neck, left arm, back, legs, and feet. She contin-
ued to take Cymbalta for nerve pain in her legs and an un-
named medication for muscle spasms in her neck but de-
scribed her pain as still 3 to 5 on a 10-point scale even with
her medication. She estimated that she could stand continu-
ously for 10 minutes and walk for 10 to 15 minutes, and
added that sitting is difficult because her legs go numb if she
doesn't move. She said that she could lift around 20 pounds
depending on her pain. She also described suffering severe

headaches four to five times weekly, with pain reaching her ears and neck and lasting around 30 minutes.

At Steps 1 and 2 of the 5-step analysis, s*ee* 20 C.F.R. § 416.920, the ALJ found that Thomas had not worked since applying for benefits and acknowledged that she suffers from Graves' disease, degenerative changes of the left shoulder and lumbar spine, and dysthymic disorder. But the ALJ refused to accept the diagnosis of fibromyalgia from Dr. Blankenstein and Dr. Rashid because neither doctor is a rheumatologist and neither doctor had conducted a "tender point" analysis, in which a doctor evaluates the pain produced by pressing 18 specific points on the body. *See Fibromyalgia*, MAYO CLINIC (Oct. 1, 2015), http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/tests-diagnosis/con-20019243. And, the ALJ continued, the impairments that he was willing to acknowledge are not "severe" individually or in combination because, he opined, they at most cause minimal limitations on Thomas's ability to perform basic work activities. The ALJ disbelieved Thomas's testimony about the intensity, persistence, and limiting effects of her symptoms, instead focusing on the medical records, in particular the opinions of Dr. Ruiz and Dr. Sands, two of the state-agency medical consultants, that Thomas's Graves' disease is not severe. He gave little weight to Dr. Rashid's statement to the community college disability office (describing limitations in walking, working, performing manual tasks, and lifting weights because of fibromyalgia and osteoarthritis), judging it not supported by objective evidence. Moreover, because the ALJ concluded that Step 2's threshold requirement of a "severe" impairment was not satisfied, he denied benefits without continuing through the

three remaining steps, *see* 20 C.F.R. § 416.920(a)(4)(ii). The Appeals Council denied review, and the district court upheld the ALJ's decision.

## II. DISCUSSION

We begin with Thomas's challenge to the ALJ's conclusion that fibromyalgia is not among her medically determinable impairments. She argues that the ALJ disregarded the diagnoses given by both Dr. Blankenstein and Dr. Rashid and that his reasons for doing so—that neither doctor is a rheumatologist or performed an analysis of tender points—are unsound.

We agree with Thomas that her doctors' lack of specialization in rheumatology is not an acceptable basis for discounting their assessments. Although the Commissioner is correct that a specialist's opinion generally merits more weight than that of non-specialist, *see* 20 C.F.R. § 416.927(c)(5), all licensed medical or osteopathic doctors are acceptable medical sources, s*ee id*. § 416.913(a)(1); SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). And there is no contrary opinion from a specialist. Indeed, because Thomas's doctors diagnosed fibromyalgia *after* her claim for benefits had been denied on reconsideration, the state-agency medical consultants did not even weigh in on this impairment. What's more, it's doubtful that they would be more qualified than Thomas's physicians to make a judgment about whether she suffers from fibromyalgia: Neither Dr. Ruiz nor Dr. Sands purported to have specialized knowledge of the claimant's alleged impairments.

As the ALJ recognized, however, a doctor's diagnosis of fibromyalgia is not alone sufficient to establish this condition as an impairment; the diagnosis must be supported by evidence meeting either of two sets of diagnostic criteria promulgated by the American College of Rheumatology, in 1990 and 2010. *See* SSR 12-2p, 2012 WL 3104869, at *2–3. But, as Thomas rightly points out, and the Commissioner concedes, the ALJ addressed only the 1990 ACR criteria by focusing exclusively on the lack of analysis of tender points. The alternate 2010 ACR criteria do not require this analysis, but rather a history of widespread pain, repeated manifestations of six or more fibromyalgia symptoms, signs, or contemporaneous conditions, and evidence that alternative explanations for those symptoms, signs, or contemporaneous conditions were ruled out. *See* SSR 12-2p, 2012 WL 3104869, at *3.

The Commissioner insists that the ALJ's omission of discussion of the 2010 ACR criteria was harmless "because Thomas has not shown that the ALJ overlooked evidence" that would have satisfied these criteria. This argument is unconvincing because, without any analysis from the ALJ, there is no basis for drawing any conclusions about what evidence he considered or overlooked. As Thomas points out in her opening and reply briefs, the medical evidence includes many reports of symptoms, signs, and contemporaneous conditions associated with fibromyalgia, including muscle aches, fatigue, and depression, *see* SRR 12-2p, 2012 WL 3104869, at *3, nn. 9–10, and details tests that her doctors conducted while looking for explanations, such as X-rays, an ultrasound, and tests of her antinuclear antibodies and rheumatoid factor. Despite the Commissioner's disclaimer in her brief, her conjecture that the ALJ would have

reached the same conclusion had he explicitly addressed the alternative set of criteria invokes an overly broad conception of harmless error of the type we have criticized previously. *See, e.g.*, *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943).

The Commissioner also argues that, even if the ALJ was wrong to omit fibromyalgia from Thomas's impairments, the error was harmless because he still proceeded to consider the objective evidence of functional limitations in concluding that Thomas's ability to perform work-related tasks is, at most, minimally affected. But this contention discounts the significance of Thomas's further argument that the ALJ lacked substantial evidence for his conclusion that none of her *other* physical impairments is severe.

Impairments are not "severe" when they do not significantly limit the claimant's ability to perform basic work activities, including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 416.921. The SSA has specified further that a non-severe impairment is "a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996). When evaluating the severity of an impairment, the ALJ assesses its functionally limiting effects by evaluating the objective medical evidence and the claimant's statements and other evidence regarding the intensity, persistence, and limiting effects of the symptoms. *Id*. at *2. Other circuits have described the Step 2 inquiry as a *de minimis* screening for groundless claims. *See, e.g.*, *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546

(3d. Cir. 2003); *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *McDonald v. Sec. of Health and Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986).

Thomas disputes the weight the ALJ assigned to the medical opinions in the record, his interpretation of the objective evidence, and his adverse finding about her own credibility in concluding that her limitations are minimal. Thomas challenges the ALJ's decision to give great weight to the reviews of the evidence by Dr. Ruiz and Dr. Sands, who concluded that her Graves' disease was not severe, and little weight to Dr. Rashid's statement to the community college showing more than a minimal limitation on her abilities. She points out that, not only was Dr. Rashid a treating physician, but the consulting doctors never examined her and their reviews took place in January and April 2011, before much of the later medical evidence showing her fibromyalgia diagnosis and degenerative changes in her left shoulder.

Thomas contends that Dr. Rashid's statement to the community college about Thomas's limitations was entitled to controlling weight under 20 C.F.R. § 416.927(c)(2) and that the ALJ discounted this opinion without an adequate reason. We agree. The ALJ appears to have given Dr. Rashid's opinion little weight despite the length of her treating relationship by reasoning that Dr. Rashid had noted at one point that Thomas had full range of motion and because the ALJ thought the fibromyalgia diagnosis unfounded. But the first reason appears focused narrowly on the effects of the degenerative changes in Thomas's spine and left shoulder (not on the disabling effects of the pain caused by fibromyalgia), and the second reason was erroneous for the reasons explained

previously. The ALJ also noted Thomas's gap in treatment between August 2011 and September 2012, but the relevance of this detail to Dr. Rashid's opinion is unclear, and, in any case, the ALJ did not explore the reasons for this gap. *See Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

And even if Dr. Rashid's opinion was not entitled to controlling weight, the ALJ erred by accepting Dr. Ruiz and Dr. Sands's reviews of the evidence uncritically despite the fact that they never examined Thomas and did not have the benefit of much of the 2011 treatment records when they created their opinions. *See Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). Dr. Ruiz's mention of Graves' disease as Thomas's sole alleged physical impairment highlights the dated nature of the assessment. The ALJ said that those opinions were consistent with a later finding of Dr. Rashid about Thomas's range of motion and records showing that her Graves' disease was in check, but he did not even attempt to compare the consulting doctors' assessments with records from Thomas's treatment by Dr. Blankenstein (her main doctor throughout 2010 and 2011) or her difficulties with physical therapy, even though that evidence was consistent with Dr. Rashid's statement to the community college that Thomas had significant limitations.

Thomas also criticizes the ALJ's failure to grapple with records from Thomas's physical therapy sessions in his assessment of what the objective medical evidence says about her limitations. Even though a physical therapist is not an acceptable medical source for determining a claimant's im-

pairments, this evidence may be used to show the severity of
an impairment and how it affects a claimant's ability to func-
tion. *See* 20 C.F.R. § 416.913(d)(1); SSR 06-03p, 2006 WL
2329939, at *2 (Aug. 9, 2006). The second physical therapist's
initial evaluation and a progress note contained detailed dis-
cussions of Thomas's pain and movement limitations, in-
cluding that Thomas had difficulty with heel and straight leg
raises and bending. The ALJ ignored those statements, how-
ever, and noted only that "a resulting progress note indicat-
ed that the claimant's complaints of pain were rather vague"
and that, "on at least two occasions, the claimant refused to
do more than lay [sic] in a prone position, reportedly sec-
ondary to 'pain all over' and dizziness" (even though these
are symptoms associated with fibromyalgia as well,
*see* SRR 12-2p, 2012 WL 3104869, at *3, nn. 9). Although the
ALJ was not required to mention every piece of evidence,
providing "an accurate and logical bridge" required him to
confront the evidence in Thomas's favor and explain why it
was rejected before concluding that her impairments did not
impose more than a minimal limitation on her ability to per-
form basic work tasks. *Roddy*, 705 F.3d at 636; *see Denton v.
Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Indoranto v. Barnhart*,
374 F.3d 470, 474 (7th Cir. 2004).

Finally, Thomas correctly argues that the ALJ's credibil-
ity determination was not adequate. In finding Thomas not
credible to the extent that she described more than minimal
limitations, the ALJ relied on the seeming lack of objective
evidence supporting Thomas's subjective account of her
symptoms, but, as discussed earlier, the ALJ skipped over
the substantial findings of Thomas's treating physicians and
physical therapist that showed that her impairments indeed

would limit her ability to perform work tasks. The ALJ's invocation of Thomas's activities of daily living to discount her testimony that her limitations are more than minimal also is problematic because her ability to do limited chores, cooking, and self-care says little about her ability to perform the tasks of a full-time job, much less the Step 2 threshold that any limitations would be no more than minimal. *See Hughes v. Astrue*, 705 F.3d 276, 278–79 (7th Cir. 2013); *Craft*, 539 F.3d at 680. And the ALJ concluded from Thomas's gap in treatment between August 2011 and September 2012 that her symptoms were not as severe as she alleged, but, as noted, he did not explore her reasons for not seeking treatment, another error. *See Craft*, 539 F.3d at 679.

## III.  CONCLUSION

Because the ALJ's omission of fibromyalgia from Thomas's medically determinable impairments and his conclusion that she has no severe impairments are not supported by substantial evidence, we REVERSE the judgment of the district court upholding the Commissioner's decision to deny benefits to Thomas and REMAND for further proceedings consistent with this opinion. Thomas requests that this court direct a finding of disability, but we agree with the Commissioner that this is inappropriate because the ALJ ended his inquiry at Step 2, and, as a result, not all of the factual issues in this case have been resolved. *See Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011).