NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 5, 2016
Decided October 20, 2016

**Before**

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 16-1030

| | |
|---|---|
| IV'LEANIA PARKER, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. |
| v. | No. 2:14cv10 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, *Defendant-Appellee.* | Robert L. Miller, Jr., *Judge.* |

**ORDER**

Iv'Leania Parker applied for Disability Insurance Benefits and Supplemental Security Income claiming disability based on her history of breast cancer, fibromyalgia, carpal tunnel syndrome, and glaucoma. An administrative law judge denied benefits, and the Appeals Council and district court upheld that decision. Because the ALJ's decision is supported by substantial evidence, we affirm the decision.

Parker applied for benefits in May 2012, when she was 49 years old, and alleges

an onset date in May 2011. Her date last insured was in June 2014. Parker asserted that she is unable to work because of a history of breast cancer, fibromyalgia, carpal tunnel syndrome, and glaucoma. Parker has a Master's in Business Administration and worked for more than 15 years in the banking industry, mainly as a loan specialist. In applying for loan benefits, Parker alleged that in 2007 she was fired because of unidentified "problems with [her] hand and neck," but she did not say how those problems were affecting her work or what her employer said about them. The Social Security Administration denied Parker's applications initially in August 2012 and again on reconsideration in October 2012. Her hearing before the ALJ was in June 2013.

After being diagnosed with breast cancer, Parker underwent a double mastectomy in January 2012 and afterward several reconstructive surgeries. At Parker's latest follow-up in January 2013, the doctor found her to be "doing well" and had "no major concerns." None of Parker's doctors opined that her surgeries imposed any limit—not even a minor one—on her ability to work.

Parker reported a previous diagnosis of fibromyalgia to a primary-care physician in April 2013. But her medical records do not show who made the original diagnosis, when it was made, or what treatment Parker received, other than (according to what Parker told the doctor) Cymbalta that she had been given for nerve pain. Her doctor ordered refill medication for her current prescriptions—a cholesterol drug, a diuretic, and a potassium chloride supplement—but did not identify any functional limitations.

Parker also sought treatment for carpal tunnel pain. In April 2012, shortly before she applied for benefits, Parker had been examined by neurologist George Abu-Aita for numbness in her hands and pain in her hands and neck. Parker told Dr. Abu-Aita that she had had carpal tunnel surgery in 2008. Dr. Abu-Aita found decreased sensation in the nerves of her hands. He did not prescribe treatment or impose work limitations, but he did order a MRI of Parker's neck and an EMG of her hands and arms. The MRI showed only commonplace "cervical spondylosis,"[1] and the EMG ruled out "electrodiagnostic evidence of … carpal tunnel syndrome."

Parker also had received periodic treatment for glaucoma. In December 2011 she was seen by an ophthalmologist after experiencing blurriness in her eyes. She told the doctor that she had undergone laser surgery for glaucoma ten years earlier. At each

---

[1] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck." It is very common, and most people do not experience symptoms. *See Cervical Spondylosis*, MAYO CLINIC, http://www.mayoclinic.org/ diseases-conditions/cervical-spondylosis/basics/definition/con-20027408 (visited October 17, 2016).

follow-up visit the doctor found her to have normal vision and prescribed eye drops. In May 2013 Parker returned to the ophthalmologist for a check-up and reported headaches but no visual complaints. The doctor diagnosed her with early primary open-angle glaucoma.[2] She underwent laser treatment in May and June 2013. The record of Parker's final eye treatment in June 2013 shows normal visual acuity; Parker had complained of some blurriness and irritation but not headaches.

In July 2012 state-agency physician M. Siddiqui performed a consultative exam. He noted generalized muscle tenderness and limited range of motion in Parker's back but also concluded that her gait was normal and her vision, 20/20. Dr. Siddiqui also noted that Parker reported pain in her hands, yet her muscle and grip strength were normal and she could pick up and grip coins with each hand. He did not identify any functional limitation or impose any work restriction.

In August 2012, Dr. Abu-Aita recommended physical therapy for Parker's neck pain. The therapist's progress notes from Parker's final session, in September 2012, report decreased neck and back pain and increased range of motion "to 90%."

In August and October 2012, different state-agency physicians reviewed Parker's medical records, and both doctors concluded that those records do not evidence any severe impairment.

In April 2013, Dr. Abu-Aita ordered a brain MRI, seemingly as a precaution because Parker's complaints of neck pain, headache, and blurry vision could have been symptoms of multiple sclerosis.[3] A radiologist noted that the MRI showed a "nonspecific finding" which might have been "demyelinating plaques" or possibly

---

[2] Glaucoma cannot be reversed, but treatments that lower pressure in the eye can "slow or prevent vision loss." Lasers can be used to open clogged channels for patients with open-angle glaucoma. *See Glaucoma: Treatments and Drugs*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/glaucoma/basics/treatment/con-20024042 (visited October 17, 2016).

[3] *See Multiple Sclerosis: Symptoms and Causes*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/dxc-20131884 (visited October 17, 2016).

"sequela of chronic small vessel ischemic disease."[4]  The MRI also showed one other area of possible abnormality, so the radiologist recommended a CT scan for further evaluation. That CT scan eliminated the radiologist's concern about the second possible abnormality; she concluded that the MRI likely was showing prominent cortical veins in that area. Parker did not submit further medical records from Dr. Abu-Aita, so the conclusion he drew from these scans and the follow-up care he recommended, if any, is unknown.

At the hearing before the ALJ in June 2013, Parker testified to limited activities of daily living due to generalized pain and weakness. She said that she wakes feeling "totally debilitated" and at times can't get out of bed at all or needs three hours to get going. She lives alone and cares for herself but does only minimal cleaning and cooking. Parker said that she can lift or carry only a couple of pounds, can walk only a couple of blocks, can stand for only a couple of minutes, and can sit for only 30 to 40 minutes. She explained that she can use her hands to grip, feel, and manipulate objects but not without pain. Parker said that she drives to the grocery store and reads Bible passages (but uses glasses to read because of her blurred vision). She attends church but has no hobbies or other social life. Parker reported that at the time of the hearing her ongoing medical treatments were limited to taking Fiorinal with codeine, ibuprofen, and diazepam (all prescribed for pain management after her reconstructive surgeries); a cholesterol drug; and vitamins and supplements.

A vocational expert also testified. He opined that Parker could perform her past work as a loan specialist given the residual functional capacity described by the ALJ: able to lift and carry 10 pounds occasionally and less weight frequently; able to stand and walk for up to 2 hours and sit for up to 6 hours in an 8-hour workday; occasionally able to balance, stoop, crouch, and climb ramps and stairs; unable to kneel, crawl, or

---

[4] "A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in your brain and spinal cord." *See Demyelinating disease: What causes it?*, MAYO CLINIC, http://www.mayoclinic. org/diseases-conditions/multiple-sclerosis/expert-answers/demyelinating-disease/faq-20 058521 (visited October 17, 2016). Small vessel disease "refers to a group of pathological processes with various aetiologies that affect the small arteries, arterioles, venules, and capillaries of the brain." It can lead to dementia. *See* John G. Baker, et al., *Cerebral Small Vessel Disease: Cognition, Mood, Daily Functioning, and Imaging Findings from a Small Pilot Sample,* 2(1) DEMENT. GERIATR. COGN. DIS. EXTRA. 169, 169–79 (Jan–Dec 2012), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3347879/ (visited October 17, 2016).

climb ladders, ropes, or scaffolds; and unable to work around concentrated exposure to hazards or slippery, uneven surfaces. The VE also opined that Parker could find other work with those restrictions, such as working as an information clerk or telephone solicitor.

The ALJ applied the 5-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Parker was not disabled. At Step 1 the ALJ determined that Parker had not engaged in substantial gainful activity since her alleged onset in May 2011. At Step 2 the ALJ identified Parker's severe impairments as "status-post bilateral mastectomy and reconstruction; degenerative disc disease of the cervical spine; and fibromyalgia." At Step 3 the ALJ concluded that these impairments, individually or in combination, do not satisfy a listing for presumptive disability.

At Step 4, in determining Parker's RFC, the ALJ partially rejected her account of disabling limitations. The ALJ noted that neither Parker's own doctors nor the state-agency consultants had found that Parker's conditions limit her ability to work whatsoever. Nevertheless, the ALJ (with little explanation) imposed the limitations identified to the VE. The ALJ, however, did not fully credit Parker's testimony about the extent of the limitations she attributed to pain. The ALJ pointed to the opinions of Parker's physicians that she was doing well, the limited treatment prescribed by those doctors, and Parker's testimony about her activities of daily living. The ALJ decided that Parker could perform her past relevant work as a loan specialist and correspondence review clerk, as well as other jobs including telephone solicitor and receptionist.

Because the Appeals Council denied review, this court evaluates the ALJ's decision as the final word of the Commissioner. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). In this court Parker makes a number of arguments, but most of them take aim at the ALJ's assessment of her RFC. Parker contends that the ALJ ignored the MRI and CT scan of her brain, failed to consider her other impairments that aren't severe, and did not explain his credibility assessment.

We conclude that substantial evidence supports the RFC assessment. First, the ALJ permissibly omitted reference to the MRI and CT scan of Parker's brain because they do not undercut his conclusion. An ALJ is not obligated to summarize every piece of evidence, so long as he does not analyze only the evidence supporting his ultimate conclusion while ignoring the evidence that undermines it. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In his brief, Parker's lawyer asserts that the radiologist, after interpreting the MRI and CT scan, "diagnosed Ms. Parker with multiple sclerosis."

That representation is inaccurate. In making it Parker's lawyer cites only the radiology reports, which do not give a "diagnosis" but instead include a "clinical indication" of MS. The "clinical indication" is the condition that prompted a treating physician to order the diagnostic; it is not the radiologist's conclusion after reviewing the test. Instead, the "impression" section of the radiology report gives the radiologist's views,[5] and those sections identify one "non-specific finding" but otherwise normal results. No other document in the record mentions MS. As far as this record shows, Dr. Abu-Aita, the neurologist who requested the MRI and CT scan, did not diagnose or prescribe medical treatment for any condition, let alone MS, after seeing the results. Nor does the record show that any of Parker's doctors interpreted these scans to impose functional limitations. Because the scans were taken long after Parker had applied for benefits and secured counsel, one would think that any new diagnosis or treatment resulting from these scans would be included in the record. And ALJs are not meant to "play doctor" by making their own independent medical findings rather than relying on expert opinion, *see Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003), though that is what Parker's lawyer appears to do by asserting that she was diagnosed with MS.

Second, the ALJ adequately considered all of Parker's impairments and supported his credibility determination with specific evidence from the record. Contrary to Parker's assertion, the ALJ did consider impairments not found to be severe in determining Parker's RFC, as required. *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). Parker's real complaint, it seems, is that the ALJ did not fully credit her testimony about the extent of the limitations these conditions impose. As for carpal tunnel syndrome, the ALJ noted that the EMG did not corroborate the purported diagnosis, her doctor did not order any treatment for that condition or impose functional limitations, and, as the consultative examiner found and Parker herself testified, she can grip and manipulate objects. Regarding her glaucoma, the ALJ relied on the ophthalmologist's repeated findings that Parker's vision was normal, the absence of any functional limitation after her most recent laser treatment, and Parker's continuing ability to drive and read. Parker's lawyer argues that the ALJ's "mentioning of [her] visual acuity demonstrates that the ALJ does not understand

---

[5] *See* Rourke Stay, *An insider's guide to reading your radiology report*, KEVINMD, http://www.kevinmd.com/blog/2014/09/insider-guide-reading-radiology-report.html (visited September 8, 2016); *How to Read Your Radiology Report*, RADIOLOGY INFO, http://www.radiologyinfo.org/en/info.cfm?pg=article-read-radiology-report (visited October 17, 2016).

glaucoma … [because it] does not affect visual acuity." This does not follow. The danger of glaucoma is that it can *lead* to blindness,[6] but thus far Parker's treatments have successfully preserved her vision. In sum, we cannot say that the ALJ's credibility determination is "patently wrong," especially considering that he imposed a litany of functional limitations, not a single one of them recommended by a doctor involved in the case. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *see also Schmidt v. Astrue,* 496 F.3d 833, 843–44 (7th Cir. 2007) (upholding credibility decision concerning claimant's subjective complaints of pain when ALJ considered testimony, normal examination findings, and daily activities in addition to objective medical tests); *Sienkiewicz v. Barnhart,* 409 F.3d 798, 803–04 (7th Cir. 2005) (upholding credibility decision when ALJ considered conservative treatment, failure to report certain symptoms to doctors, and inconsistency of reports of extreme pain with examiner's findings in addition to lack of objective medical test findings).

Parker has one final argument that lacks merit. She contends that the ALJ erred at Step 2 in finding that her carpal tunnel syndrome and glaucoma are not severe. We recently emphasized that "[t]he Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities," *O'Connor-Spinner v. Colvin,* 2016 WL 4197915, at *6 (7th Cir. Aug. 9, 2016) (quoting *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016)); *see also Meuser v. Colvin,* No. 16-1052, slip op. at 9–10 (7th Cir. October 3, 2016). But in this case Parker's only evidence that either glaucoma or carpal tunnel syndrome affect her basic activities is her testimony that sometimes she experiences blurred vision and pain in her hands. Parker did not explain how either would impede her daily activities or her ability to work. And as we have concluded already, the ALJ's determination that her testimony was not fully credible is supported by substantial evidence. Thus the ALJ did not err in finding these impairments to be nonsevere. *See Stepp v. Colvin*, 795 F.3d 711, 719–20 (7th Cir. 2015) (concluding that carpal tunnel syndrome was not severe impairment since no evidence established that condition imposed functional limitations); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1164–65 (9th Cir. 2008) (same); *Ukolov v. Barnhart*, 420 F.3d 1002, 1004–06 (9th Cir. 2005) (glaucoma not severe impairment); *Arles v. Astrue,* 438 Fed. App'x. 735, 737–40 (10th Cir. 2011) (same); *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. App'x. 140, 146 (3d Cir. 2010) (concluding that glaucoma was not severe impairment since functional limitations did not result).

---

[6] *See Glaucoma: Treatments and Drugs*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/glaucoma/basics/treatment/con-2002404 2 (visited October 17, 2016).

Accordingly, because the ALJ did not ignore any line of evidence and substantial evidence supports his decision, we affirm.