NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 27, 2018
Decided March 21, 2018

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 17-2017

| | |
|---|---|
| KAREN MURPHY, | Appeal from the United States District |
| *Plaintiff–Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 16 C 2366 |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | Sidney I. Schenkier, |
| *Defendant–Appellee.* | *Magistrate Judge.* |

## O R D E R

Karen Murphy applied for disability insurance benefits, alleging that a stroke in April 2007 left her disabled. An administrative law judge awarded Murphy benefits through November 2008. Murphy challenges the ALJ's determination that she experienced medical improvement and could work beginning in December 2008. Because substantial evidence supports the ALJ's decision, we affirm the district court's judgment upholding that decision.

## I. BACKGROUND

Murphy's medical records reflect gradual improvement, so we begin our discussion of the medical evidence in April 2008—one year into her recovery and during the period when the ALJ found her disabled. At that time, Murphy's neurologist, Dr. Joseph Mayer, opined that she suffered from "very mild aphasia and some significant loss of sensation." In particular, on her right (dominant) side Murphy experienced "waxing and waning paresthesias" (tingling sensations) and decreased proprioception (the ability to sense one's body's position). Murphy's chief complaint was headaches, which she experienced almost nightly. Dr. Mayer thought the headaches were unrelated to her stroke and prescribed gabapentin (a nerve-pain medication) and Fioricet (an analgesic).

During a follow-up appointment in July 2008, Murphy reported that her headaches "were not as bad," occurring about twice per week. This improvement had occurred though she had not taken her medications as prescribed—she had taken "some occasional Fioricet when over-the-counter medication d[id] not help," but she had never taken the gabapentin. (Murphy later said that her prescription medications made her tired.) Dr. Mayer concluded that Murphy's headaches had "clearly improved." He described her speech as "quite fluent" and her overall condition as "fairly stable."

Murphy returned to Dr. Mayer in October 2008 with reports of "at least four headaches per week," often in the middle of the night. She also expressed frustration with "the residual effects from her stroke," noting that the sensation in her right hand was "still quite bad" and she had "some difficulty with speech," especially when tired. Dr. Mayer encouraged Murphy to take her prescribed medications and ordered a magnetic resonance angiography ("MRA"). This MRA, taken in December 2008, showed improvement in the degree of stenosis (abnormal narrowing) in Murphy's proximal left internal carotid artery. An MRA taken soon after Murphy's stroke had shown that the artery was essentially blocked, but the December 2008 MRA showed only 60% stenosis.

Around this time Murphy was diagnosed with moderate plantar fasciitis (inflammation of the tissue) in her left heel, which a podiatrist treated with orthotics, a splint, and one-time injections of a corticosteroid and an anesthetic.

Other than a brief visit to the hospital in January 2009 for chest pain and shortness of breath, Murphy sought no further treatment until October 2009, when she visited her primary care doctor with various complaints. She reported having headaches at least 5 times per week. Fioricet usually helped, though sometimes she took Excedrin. She also complained of chronic pain in her right arm. Sometimes this was "more of a sharp pain" and sometimes she also experienced paresthesia, but she could still "do anything with the arm." She added, without elaboration, that she sometimes got confused easily. The doctor prescribed stretches, heat, a muscle relaxant, and an anti-inflammatory drug for the headaches. He also told Murphy to consult with her neurologist if she continued to have headaches, pain in her arm, or episodes of confusion.

Murphy followed up with Dr. Mayer in December 2009. She complained of numbness on the right side of her body, headaches, and forgetfulness. Dr. Mayer assessed Murphy as having "quite fluent" speech, "slightly slower" finger movements with her right hand than with her left hand, and "moderately diminished" proprioception in her right hand. Dr. Mayer concluded that Murphy had "made a very good recovery" overall, though he noted her frustration with "her persistent deficits."

Murphy applied for disability insurance benefits in September 2008, alleging that she became disabled the day of her stroke. An ALJ conducted a hearing on her application in July 2010, and recommended denying her request for benefits. The Appeals Council adopted this recommendation. Murphy then sought judicial review of the agency's decision. She lost in the district court, but this court remanded the case after concluding that the agency's decision was not supported by substantial evidence. *See Murphy v. Colvin*, 759 F.3d 811 (7th Cir. 2014).

In June 2015 a different ALJ held a second hearing. Murphy, appearing with counsel, testified mostly about her condition at the end of 2007. She said that by then she had recovered enough to pick up coins, tie her shoes, and make a fist. But she could not use her hands, stand, or walk for more than two hours per day, and she had difficulty communicating. She also had headaches five days per week, lasting at least eight hours at a time. She did not like taking her prescription medications because they made her tired, but she "took a lot of Excedrin because [it] seemed to help a lot."

Murphy acknowledged that her condition had improved since 2007, but she said that she had never recovered "totally" from the stroke and that her attempts to work had proven unsuccessful. In 2010 she had tried to work part-time as a cashier, but could

not do the work because of headaches and difficulty standing and counting money. She had most recently worked in 2013 as a hostess at a casino, but she quit because of headaches and arm pain.

The parties stipulated that Murphy's husband would testify as he had at the first hearing. Of particular significance to this appeal, Murphy's husband had estimated that headaches and "constant pain" left Murphy bedridden 12 days per month in 2008 and 7 days per month in 2010.

At the 2015 hearing the ALJ also heard testimony from medical expert Dr. Karl Manders, a specialist in pain medicine and neurosurgery. The ALJ told Dr. Manders to focus on the period of April 13, 2007 (the date of Murphy's stroke) through December 31, 2007 (her date last insured). Dr. Manders initially estimated that Murphy's condition matched Listing 12.02 (organic brain disorders) or 11.04 (vascular insult to the brain) for 18 to 24 months after her stroke. Then, after reexamining Dr. Mayer's treatment notes, Dr. Manders said that Murphy "did not meet a listing" as of October 31, 2008. Around that time, Dr. Manders opined, Murphy would have had trouble performing "fine manipulations" with her right hand but would not be limited in her ability to sit, stand, walk, or speak. He added that Murphy's headaches were probably unrelated to her stroke. And when Murphy's lawyer asked whether a treatment note from December 2009 suggested that she should be limited to light or sedentary work, Dr. Manders said that at that time Murphy "probably could do light activity" because her only neurological problem by then was her proprioception, "which doesn't have a lot of impact" on most vocational activities.

A vocational expert also testified about the jobs that would be available to someone with Murphy's limitations. The ALJ asked him to consider a claimant who (subject to limitations for certain postures and work environments) could frequently handle, finger, and feel with the dominant right arm, with no limitations on the left; occasionally reach overhead with both arms; and who retained the mental capacity to perform simple tasks. The vocational expert opined that such a person could perform light, unskilled work, even if she could never feel her right arm. But such work would be unavailable if she could finger only occasionally or missed more than one day of work per month because of headaches.

The ALJ issued a partially favorable decision. She first applied the familiar five-step evaluation process for assessing disability in adults, 20 C.F.R. § 404.1520(a)(4). Here she found that the residual effects of Murphy's stroke—including her cognitive

and communication difficulties—were severe impairments but her plantar fasciitis was not severe. She concluded that Murphy's impairments left her disabled after her stroke. Then, applying the eight-step process for assessing medical improvement, 20 C.F.R. § 404.1594(f), the ALJ determined that Murphy could work beginning December 1, 2008. In reaching this conclusion, the ALJ discredited Murphy's and her husband's testimony about the extent of her impairments. The ALJ determined that their testimony about disabling headaches after November 2008 was "not supported by the claimant's reports to her physicians or the treatment sought." She explained that Dr. Mayer's treatment notes showed that Murphy made a "very good recovery" and that her headaches were unrelated to her stroke and largely controlled by over-the-counter medication. The ALJ thus awarded Murphy a period of disability insurance benefits from April 13, 2007, through November 30, 2008.

Murphy did not seek review from the Appeals Council, making the ALJ's decision final. *See* 20 C.F.R. § 404.984 (authorizing claimant to skip Appeals Council review when case was previously remanded from federal court). A magistrate judge, presiding with the parties' consent, upheld the ALJ's decision and denied Murphy's request for reconsideration. This appeal followed.

## II. DISCUSSION

We will affirm if substantial evidence supports the ALJ's decision, but reverse if the ALJ ignored significant evidence of disability. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). An ALJ must confront evidence that supports the applicant's claim and at least "explain why it was rejected before concluding that her impairments did not impose more than a minimal limitation on her ability to perform basic work tasks." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016).

We begin with Murphy's most developed argument: that the ALJ improperly discredited testimony from Murphy and her husband about the extent of her impairments after November 2008. Murphy argues that the ALJ erred by relying "solely on a lack of objective medical evidence to discredit Murphy and her husband." And she insists that she "was not required to report the details of her headaches to her physicians." But the ALJ's adverse credibility finding was not based on the *absence* of details in her medical records; rather, it was properly based on the incongruity between the relatively modest symptoms Murphy reported to her doctors and the more severe symptoms Murphy and her husband reported to the ALJ. *See Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005). And while Murphy suggests that her reports to her

doctors have no bearing on her husband's credibility, it was proper for the ALJ to consider whether Murphy's husband's testimony aligns with other evidence in the record. The ALJ's adverse credibility finding was not patently wrong. *See Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018).

Moreover, substantial evidence supports the ALJ's conclusion that Murphy experienced medical improvement beginning on December 1, 2008. Most significantly, there is Dr. Manders's opinion that she "did not meet a listing" by October 31, 2008. This timeframe also corresponds with a gap in Murphy's medical records: after the MRA taken in December 2008, which showed that the blockage in one of Murphy's carotid arteries had improved significantly since her stroke, Murphy did not seek treatment for her headaches or stroke-related impairments until October 2009.

Murphy's two remaining arguments fare no better. First, Murphy faults the ALJ for not discussing a portion of Dr. Manders's testimony during cross-examination that, she says, undermines the date of medical improvement assigned by the ALJ. But Murphy mischaracterizes Dr. Manders's testimony. As mentioned above, counsel asked Dr. Manders to consider whether a treatment note from December 2009 showed that Murphy should be limited to light or sedentary work. Dr. Manders responded that "late in 2009 going into 2010 that [sic] she probably could do light activity." Murphy reads into this response an opinion that Dr. Manders never expressed—namely, that "Murphy ceased meeting a listing . . . *no earlier* than December 21, 2009, and possibly in 2010" (emphasis added). But this interpretation of Dr. Manders's testimony ignores his statement on direct examination that Murphy "did not meet a listing" by October 2008. That counsel asked Dr. Manders to discuss limitations that would have existed in December 2009 does not undermine Dr. Manders's earlier-stated view.

Murphy concludes with an undeveloped argument that the ALJ should have questioned the vocational expert about additional functional limitations caused by the plantar fasciitis in her left heel. She does not specify what those limitations should be, though it appears from her brief that she believes they would include limitations against standing or walking for long periods. But Murphy's medical records do not mention any problems with plantar fasciitis (or any related condition) after October 2008, when a podiatrist treated Murphy's left heel with orthotics, a splint, and one-time injections of a corticosteroid and an anesthetic. And Dr. Manders opined—without contradiction by any other medical source—that Murphy was not limited in her ability to sit, stand, or walk, through her date last insured.

### III. CONCLUSION

Because substantial evidence supports the ALJ's decision, we AFFIRM the district court's judgment upholding that decision.